**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BLACKOAK LIFE LIMITED AS GENERAL PARTNER TO BLACKOAK INVESTORS LP, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>METROPOLITAN LIFE INSURANCE COMPANY,<br><br>Defendant. | CASE NO. 1:25-cv-5749<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR BREACH OF CONTRACT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, by and through the undersigned attorneys, brings this action on behalf of itself and all others similarly situated against Defendant Metropolitan Life Insurance Company ("MetLife").

## NATURE OF THE ACTION

1. This is a class action brought on behalf of Plaintiff and similarly situated owners of MetLife life insurance policies. Plaintiff seeks to represent a class of MetLife policyholders who have been subjected to an unlawful cost of insurance rate increase.

2. The policies at issue in this case are flexible premium universal life policies issued, insured, or assumed by MetLife or its predecessor(s) in interest that were subjected to an increase in COI rates announced in 2024 (collectively, the "Policies").

3. The principal benefit of universal life policies generally, and the Policies specifically, is that, unlike other kinds of whole life insurance that require fixed monthly premium payments, the premium payments required for universal life policies are flexible and need only be sufficient to cover the cost of insurance charges and certain other specified expenses, which are typically levied each month.

4. The cost of insurance charge, often called a COI charge, is typically the highest charge that a policyholder pays. Because the COI charge is a function of the COI rate, the policy provision explaining how the COI rates are calculated, and whether they can be changed and how, is one of the most important parts of the contract.

5. Here, Plaintiff's policy has the following paragraph describing the COI rate:

**Monthly Cost of Insurance Rates**

At the beginning of each certificate year, the monthly cost of insurance rate is determined using the insured's attained age. The monthly cost of insurance rate is based on the attained age and rate class. For the initial face amount, we will use the rate class on the certificate date. For each increase, we will use the rate class applicable to the increase. If the death benefit equals a percentage of the Accumulation Account Value, any increase in Accumulation Account Value will cause an automatic increase in the death benefit. The rate class for such increase will be the same as that used for the most recent increase that required proof that the insured was insurable by our standards.

6. In late 2024, after Plaintiff's policy had been in force for more than 20 years, MetLife announced in a letter to Plaintiff that a large "rate adjustment" set to take effect in 2025. The letter said that this "change in cost of insurance" will be effective on April 1, 2025. The letter stated that:

> Your insurance was initially issued as part of the benefits package for eligible employees of FREMONT GENERAL AND AFFILIATED COMPANIES.
>
> FREMONT GENERAL AND AFFILIATED COMPANIES has since terminated its group contract with MetLife, and a rate adjustment is being made to align your rates with those of other terminated groups.

The letter then provided a second and conflicting rationale for the change, stating that the "adverse change in the current scale of nonguaranteed elements is based on expectations of the future cost of providing the benefits under the policy." Subsequent correspondence sent by MetLife to Plaintiff then provided a third conflicting explanation, stating "that a rate increase was needed based on the experience of that terminated GVUL [group variable universal life] block." As MetLife explained in this correspondence, "MetLife discovered that the block of terminated groups was running at a loss and, therefore, determined a rate increase was needed. This type of periodic

review, where an insurer looks at the premiums ***received*** versus the ***paid*** claims and expenses specific to a group plan to determine if the current premium rates are sufficient to cover the death claims expected, is standard in the insurance industry." (emphasis added). According to this explanation, the increase was not being made to "align" rates "with other terminated groups," or as a result of a change in "expectations of the future cost of providing benefits," but instead based on a historical analysis of "premiums received"—which are not the same as COIs—and "paid claims" for some undefined "block of terminated groups."

7. Whichever of these conflicting explanations is the truth, none of them is a permitted basis for a rate hike. Nothing in the policy says that COI rates can be changed to "align your rates with those of other terminated groups." Nothing in the policy says that there can be an "adverse change" in COI rates "based on expectations of the future cost of providing benefits under the policy." Nothing in the policy says the COI rates can increase "based on the experience of that terminated GVUL block." And nothing in the Policy states that if some ill-defined "block of terminated groups was running at a loss" then COI rates can be increased. Rather, the policy says that the "monthly cost of insurance rate is determined using the insured's attained age" and the "monthly cost of insurance rate is based on the attained age and rate class."

8. Further, there are separate and additional COI rates in the policy for child and spousal riders, and those provisions (unlike the provision at issue here) state that spousal and child "cost of insurance rates will be determined by us based on expectations of future experience." But the main COI rate provision at issue here contains no such provision. As a result, MetLife's stated rationale of changing the main COI rate "based on expectations of future cost" violates the plain terms of the policy, which does not authorize that.

9. The size of the COI increases was enormous. After Plaintiff's policy had been in force for over 20 years, with all due premiums paid, the letter announced a variable hike in Plaintiff's future COI rates ranging from 96% to 117% increase for each year. And this is in addition to the administrative fees, premium expense charge, and other charges levied on the policy. The chart sent with the letter, excerpted below, demonstrates the massive size of the increases:

**Cost of Insurance Rates**

| Age | Current Cost of Insurance | New Cost of Insurance | Percentage Change | Guaranteed Rate | Age | Current Cost of Insurance | New Cost of Insurance | Percentage Change | Guaranteed Rate |
|---|---|---|---|---|---|---|---|---|---|
| 20 | 0.041 | 0.0737 | 79.76% | 0.163 | 60 | 0.433 | 0.8991 | 107.64% | 1.450 |
| 21 | 0.041 | 0.0737 | 79.76% | 0.165 | 61 | 0.485 | 1.0157 | 109.42% | 1.576 |
| 22 | 0.041 | 0.0737 | 79.76% | 0.163 | 62 | 0.536 | 1.1343 | 111.62% | 1.723 |
| 23 | 0.041 | 0.0737 | 79.76% | 0.163 | 63 | 0.577 | 1.2298 | 113.14% | 1.891 |
| 24 | 0.041 | 0.0737 | 79.76% | 0.161 | 64 | 0.639 | 1.3749 | 115.16% | 2.078 |
| 25 | 0.052 | 0.0927 | 78.27% | 0.159 | 65 | 0.711 | 1.5427 | 116.98% | 2.276 |
| 26 | 0.052 | 0.0927 | 78.27% | 0.158 | 66 | 0.798 | 1.6923 | 112.07% | 2.486 |
| 27 | 0.052 | 0.0927 | 78.27% | 0.158 | 67 | 0.850 | 1.7628 | 107.39% | 2.704 |
| 28 | 0.052 | 0.0927 | 78.27% | 0.159 | 68 | 0.946 | 1.9143 | 102.36% | 2.933 |
| 29 | 0.052 | 0.0927 | 78.27% | 0.163 | 69 | 1.051 | 2.0756 | 97.49% | 3.188 |
| 30 | 0.062 | 0.1116 | 80.00% | 0.167 | 70 | 1.157 | 2.5111 | 117.04% | 3.478 |
| 31 | 0.062 | 0.1116 | 80.00% | 0.172 | 71 | 1.279 | 2.7086 | 111.77% | 3.813 |
| 32 | 0.062 | 0.1116 | 80.00% | 0.178 | 72 | 1.420 | 2.9325 | 106.51% | 4.208 |
| 33 | 0.062 | 0.1116 | 80.00% | 0.187 | 73 | 1.560 | 3.1399 | 101.28% | 4.661 |
| 34 | 0.062 | 0.1116 | 80.00% | 0.196 | 74 | 1.726 | 3.4737 | 101.26% | 5.163 |
| 35 | 0.062 | 0.1116 | 80.00% | 0.207 | 75 | 1.901 | 3.8266 | 101.29% | 5.708 |
| 36 | 0.062 | 0.1116 | 80.00% | 0.221 | 76 | 2.112 | 4.2504 | 101.25% | 6.284 |
| 37 | 0.062 | 0.1116 | 80.00% | 0.238 | 77 | 2.392 | 4.8140 | 101.25% | 6.884 |
| 38 | 0.062 | 0.1116 | 80.00% | 0.257 | 78 | 2.699 | 5.4320 | 101.26% | 7.517 |
| 39 | 0.062 | 0.1116 | 80.00% | 0.278 | 79 | 3.040 | 6.1187 | 101.27% | 8.203 |
| 40 | 0.072 | 0.1406 | 95.28% | 0.303 | 80 | 3.926 | 7.6979 | 96.07% | 8.968 |
| 41 | 0.072 | 0.1406 | 95.28% | 0.329 | 81 | 4.531 | 8.8836 | 96.06% | 9.837 |
| 42 | 0.072 | 0.1406 | 95.28% | 0.357 | 82 | 4.942 | 9.6910 | 96.09% | 10.829 |
| 43 | 0.082 | 0.1614 | 96.83% | 0.386 | 83 | 5.389 | 10.5676 | 96.10% | 11.941 |
| 44 | 0.093 | 0.1821 | 95.81% | 0.416 | 84 | 5.871 | 11.5111 | 96.07% | 13.150 |
| 45 | 0.103 | 0.2028 | 96.89% | 0.449 | 85 | 6.406 | 12.5608 | 96.08% | 14.440 |
| 46 | 0.113 | 0.2213 | 95.84% | 0.483 | 86 | 6.967 | 13.6611 | 96.08% | 15.795 |
| 47 | 0.124 | 0.2420 | 95.16% | 0.520 | 87 | 7.580 | 14.8630 | 96.08% | 17.213 |
| 48 | 0.144 | 0.2812 | 95.28% | 0.559 | 88 | 8.237 | 16.1502 | 96.07% | 18.699 |
| 49 | 0.155 | 0.3043 | 96.32% | 0.603 | 89 | 8.912 | 17.4743 | 96.08% | 20.262 |
| 50 | 0.165 | 0.3440 | 108.48% | 0.651 | 90 | 9.604 | 18.8307 | 96.07% | 21.925 |
| 51 | 0.186 | 0.3882 | 108.71% | 0.705 | 91 | 10.332 | 20.2587 | 96.08% | 23.733 |
| 52 | 0.196 | 0.4103 | 109.34% | 0.767 | 92 | 11.076 | 21.7189 | 96.09% | 25.762 |
| 53 | 0.216 | 0.4521 | 109.31% | 0.836 | 93 | 11.847 | 23.2299 | 96.08% | 28.155 |
| 54 | 0.237 | 0.4939 | 108.40% | 0.911 | 94 | 12.628 | 24.7616 | 96.08% | 31.307 |
| 55 | 0.268 | 0.4939 | 84.29% | 0.988 | | | | | |
| 56 | 0.289 | 0.5309 | 83.70% | 1.071 | | | | | |
| 57 | 0.320 | 0.5993 | 87.28% | 1.155 | | | | | |
| 58 | 0.361 | 0.6905 | 91.27% | 1.244 | | | | | |
| 59 | 0.402 | 0.7851 | 95.30% | 1.342 | | | | | |

10. As a direct result of MetLife's actions, Plaintiff has been required to pay and has paid the exorbitant and unjustified new COI charges.

## THE PARTIES

11. Plaintiff BlackOak Life Limited, acting as General Partner to BlackOak Investors LP, is the owner of a group variable universal life insurance policy (Policy No. 0001878344) issued by MetLife in 2002. BlackOak Investors LP is a limited partnership organized under the laws of the United Kingdom of Great Britain and Northern Ireland ("UK"), with its principal place of business in the UK. BlackOak Life Limited is a private limited company, incorporated in England, UK, with its principal place of business in the UK. Both BlackOak Life Limited and BlackOak Investors LP are citizens of the UK.

12. Defendant MetLife is incorporated under the laws of the State of New York and its principal place of business is in the State of New York. MetLife is a citizen of New York.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over the parties to this action. Plaintiff is a resident of the UK. MetLife transacts business in New York, and the increase letter lists its address in "New York, NY 10166," in midtown Manhattan.

14. Jurisdiction over MetLife is also proper because it has registered with the Secretary of State, purposely availed itself of the privilege of conducting business in New York, and because it currently maintains systematic and continuous business contacts with this State. MetLife regularly transacts business in New York and, on information and belief, hundreds of the putative Class Members are New York residents.

15. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because this is an action between a citizen of a state and a citizen of a foreign jurisdiction with an amount in

controversy that exceeds $75,000, excluding interests and costs, and also under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the Complaint alleges claims on behalf of a national class of policyholders who are minimally diverse from MetLife, as there are individuals who are members of the putative class that are citizens of a state other than New York, and because the aggregate of these claims exceed $5,000,000.

16. Venue is proper in this District under 28 U.S.C. § 1391 because MetLife maintains substantial operations in this District; many Class Members either reside or did business with MetLife in this District; MetLife engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District, and because MetLife entered into transactions and received substantial profits from policyholders who reside in this District.

## FACTUAL BACKGROUND

### A. The MetLife Policies at Issue

17. The Policies are flexible premium universal life policies issued by MetLife (including its predecessors) in or around the early 2000s. The class on whose behalf this action is being brought consists of all owners of universal life insurance policies (including group universal and variable universal life insurance policies,), issued, insured or assumed by MetLife that have been, or will be, subjected to the COI rate increase that MetLife began announcing in 2024.

18. Traditionally, life insurance companies sold two types of policies: term and whole life insurance. Term life insurance is for a term of years, normally building up no cash value and expiring without value. Whole life insurance provides coverage for life and provides an increasing cash value that is available when needed. The premiums remain level throughout the life of the policy.

19. Universal life insurance emerged in the 1980s and provides more flexibility than whole or term life insurance. There are no fixed or minimum premium payments required by the policies. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for universal life policies need only be sufficient to cover the COI charges and certain other specified expenses. The COI charge is typically the highest charge that a policyholder pays.

20. Universal life policies are designed to be permanent policies, meaning they are held until the death of the insured. Under the provisions of the Policies, separate accounts are established for each policy, tallied in an "accumulation account value," into which the policyholder's premium payments are deposited. At the end of each policy month, MetLife withdraws a COI charge and an expense charge from the Policy's accumulation account value. MetLife also deducts other charges, such as a 2.25% premium charge deducted from each premium payment.

21. Premiums can be allocated into a General Account or into Divisions of a Separate Account. The accumulation account value in the General Account earns interest at the declared interest rate not less than the guaranteed minimum interest rate specified in the policy. Plaintiff's policy, for example, provides for a guaranteed interest at the rate of 4%. The accumulation account value in each Separate Account Division grows in proportion to that Division's Net Investment Factor, which, according to the policy, measures the investment performance of the relevant Division. A charge is also levied against the Net Investment Factor, not to exceed .9% each year, which the policy says is "for mortality and expense risks."

22. The size of the COI charge is highly significant to Plaintiff and all universal life Policyholders for at least two important reasons. First, it informs the minimum amount of money

they must pay to keep a policy in force. Second, high COI rates can quickly diminish a policy's accumulation account value (i.e., the savings component) and reduce the amount of money on which the policyholder can earn interest. Even small changes in the COI rate can produce a dramatic increase in the dollar amount of the COI charged by MetLife. The higher the COI rate, the greater the premiums required to maintain a positive balance in the accumulation account value. Generally, if a policy accumulation account value diminishes such that COI charges can no longer be deducted, and the appropriate time expires after MetLife provides an accurate and adequate grace notice, then a policy may lapse unless additional premiums are paid in.

23. Plaintiff's policy includes the following provision explaining that the cost of insurance charge is a function of the COI rate, the death benefit, and the Accumulation Account Value:

**Monthly Cost of Insurance**

The monthly cost of insurance for the following month is deducted on the monthly anniversary date. The monthly cost of insurance is 1, below, multiplied by the difference between 2 and 3 below:

1. The monthly cost of insurance rate divided by 1,000.
2. The death benefit at the beginning of the certificate month divided by 1.00327374.
3. The Accumulation Account Value at the beginning of the certificate month, before the deduction of the monthly cost of insurance.

24. Plaintiff's policy also contains the following provision regarding the "cost of insurance" rate:

**Monthly Cost of Insurance Rates**

At the beginning of each certificate year, the monthly cost of insurance rate is determined using the insured's attained age. The monthly cost of insurance rate is based on the attained age and rate class. For the initial face amount, we will use the rate class on the certificate date. For each increase, we will use the rate class applicable to the increase. If the death benefit equals a percentage of the Accumulation Account Value, any increase in Accumulation Account Value will cause an automatic increase in the death benefit. The rate class for such increase will be the same as that used for the most recent increase that required proof that the insured was insurable by our standards.

25. This provision also limits what the COI rate is "based on," namely, "the attained age and rate class" of the insured. MetLife is not permitted, for example, to increase COI Rates

because the group policy terminated, or to align rates with other terminated policies, or based on expectations of future cost factors, or based on whether a block of terminated groups is running at a loss.

26. The policy was issued as a group policy, through Fremont General and Affiliated Companies. The COI increase letter, and subsequent correspondence from the carrier, states that the group policy was terminated in 2009, but the Plaintiff's policy continued "as a direct billed participant." That is, the policy automatically converted to an "individual certificate." MetLife also said that the increase in COI rates announced in 2024 was made to align rates with other terminated policies, which it claims it was permitted to do under the converted individual policy.

27. The policy, however, provides that

> If an insured's eligibility under the Contract ends due to the termination of the contract or termination of the employee's employment, your coverage, if still in force, will convert automatically to an individual Certificate. Such individual Certificate will provide benefits which are identical to those provided under this certificate.

28. Nothing in the policy permits MetLife to charge higher COI rates if the policy converts to an individual Certificate. To the contrary, the policy promises that the benefits will be "identical" under the individual and group Certificates.

29. The Policies are all issued on standardized form policies, and owners are not permitted to negotiate different terms. They are all contracts of adhesion.

**B. <u>MetLife's Announcement of the Unlawful COI Rate Hike</u>**

30. Beginning in late 2024, MetLife suddenly announced the unilateral COI rate increase on the Policies.

31. MetLife began to notify Policyholders of the COI rate increase in written correspondence. In the letter, MetLife purported to explain why it was imposing "a change in cost

of insurance rates." In the same letter, MetLife gave two separate, and inconsistent, explanations for why it was increasing rates. First, it stated:

> Your insurance was initially issued as part of the benefits package for eligible employees of FREMONT GENERAL AND AFFILIATED COMPANIES.
>
> FREMONT GENERAL AND AFFILIATED COMPANIES has since terminated its group contract with MetLife, and a rate adjustment is being made to align your rates with those of other terminated groups.

32. Second, MetLife stated, in that same letter, "The adverse change in the current scale of nonguaranteed elements is based on expectations of the future cost of providing the benefits under the policy." MetLife's letter also said that the "Cost of Insurance is the charge that compensates MetLife for the risk an insured may die requiring MetLife to pay a death benefit."

33. MetLife did not reference the policy language in the letter, nor say or purport to explain how the increase could be consistent with the policy terms.

34. MetLife began imposing the COI increase on the Policies, resulting in a massive increase in the premiums necessary to maintain coverage. The letter acknowledges that the change "affects your premium payments" and "will reduce the accumulation value and may increase the risk of policy lapse based on continued payment of current premiums."

35. The letter also announced the massive size of the COI increases. For Plaintiff's policy, the change increased COI rates by over 115% in some years. Plaintiff and Class Members are now required to pay much higher COI rates to maintain the same level of coverage under their respective Policies.

**C. <u>MetLife's Unlawful COI Hike</u>**

36. The Polices do not authorize MetLife to set or increase COI rates in whatever amount or by whatever method it determines.

37. Rather, the Policy states the COI rate "is based on the attained age and rate class." Nothing more. As a result, MetLife's stated reasons for the increase violate the plain language of the policies.

38. In addition, and independently, MetLife's stated justifications are also factually wrong. MetLife claimed that the change "is based on expectations of the future cost of providing the benefits under the policy." But no change to any "future cost factors" independently, nor when considering all of the factors together, could warrant the massive COI increase. Not only did MetLife ignore positive changes in cost factors – such as corporate tax reform under the Tax Cuts and Jobs Act (TCJA) that benefited MetLife by cutting the assumed tax rate from 35% to 21% – but recent changes in cost factors could not possibly warrant an increase, much less one of this massive size.

### a. MetLife's Expectations of Future Mortality Experience Have Improved

39. MetLife's increase letter states that "The Cost of Insurance is the charge that compensates MetLife for the risk an insured may die requiring MetLife to pay a death benefit." That language is not found in the policy. By contrast, the policy states that a separate charge on the net investment factor will not "exceed .0024547% per day" and is "for mortality and expense risks." In addition, MetLife's mortality expectations have improved since the issuance of this policy, which should lead to lower COI rates if anything, not higher ones.

40. MetLife recently has identified decreased mortality as a driver of its own profitability. In its 2023 Annual Report, MetLife reported a year-over-year increase in adjusted earnings of $301 million in its Group Benefits section primarily due to favorable mortality. Again, in its 2024 Annual Report, MetLife identified "favorable mortality"—*i.e.*, fewer deaths—in multiple segments as a primary driver of its adjusted earnings. And, in its Q1 2025 earnings call

in May 2025, both its CEO and CFO highlighted favorable mortality trends in the working age population as responsible for significant increases in the company's adjusted earnings and "consistent with CDC data."

41. MetLife's expectations as to "mortality" could not have warranted its increase in COI Rates, much less a massive one. To the contrary, mortality expectations have improved since MetLife issued the Policies.

42. Insurers like MetLife typically set and quantify their mortality expectations regularly. They perform experience studies which examine their historical mortality experience and, from that mortality experience, develop predictions of mortality they expect to see in the future. These expectations are explicitly quantified in the form of mortality tables, which are charts showing the expected rate of death at a certain age. Rate of death can be measured as a percentage or in terms of the number of deaths per thousand. Separate tables are produced to reflect groups with different mortality. For example, mortality tables will usually have separate sections for gender, and different rates depending on the age of the insured. Mortality tables are used by actuaries to calculate insurance rates, and, if developed properly, are designed to reflect the carrier's expectations of future mortality.

43. For example, the 1980 version of these tables were published by the Society of Actuaries and endorsed by the NAIC, and called the 1980 Commissioners Standard Ordinary Mortality Table ("1980 CSO Mortality Table"). The 1980 CSO Mortality Tables were the industry-standard table until 2001. In 2001, at the request of the NAIC, the SOA and the American Academy of Actuaries produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 identified that expected mortality rates had improved significantly each year since the 1980 CSO Mortality Tables were issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted . . . [C]urrent mortality levels . . . are considerably lower than the mortality levels underlying the 1980 CSO Table.

44. The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." This means the tables showed a substantial improvement in mortality in a 20-year time period. These mortality improvements represent a substantial benefit to MetLife. The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the earlier 1980 CSO Mortality Table, namely the table used to set guaranteed COI rates for the Plaintiff policy.

45. The 2001 CSO Mortality Table, in turn, was updated about 14 years later by the SOA, producing the "2017 CSO Mortality Table." The SOA report was published in October 2015 and showed further significant reductions in insurance company reserves compared to the 2001 CSO Mortality Table due to mortality improvements since 2001.

46. Since these dates, the SOA has published updated mortality tables to reflect the evolving industry experience. Major mortality tables they have published over the last few decades include:

- 1975-1980 Basic Select and Ultimate Mortality Table ("1975-80 SOA Table")
- 2001 Valuation Basic Mortality Table ("2001 VBT")
- 2008 Valuation Basic Table ("2008 VBT")
- 2015 Valuation Basic Table ("2015 VBT")

47. The 1975-80 SOA Table reflected the death rates observed by twenty-one large life insurance companies with policy anniversaries between 1975 and 1980. That is, the 1975-80 SOA Table was derived from data at a roughly similar time to the 1980 CSO tables. The 2001, 2008, and 2015 VBT were designed, in turn, to reflect the SOA estimate of mortality as of 2001, 2008 and 2015, respectively. Each table following the 1975-80 SOA Table showed a general and significant improvement in mortality from its prior table. This demonstrates that from both (i) the time of the 1980 CSO Table, namely the table used to generate guaranteed values in the Plaintiff policy, and (ii) the date of issue of the Plaintiff policy, mortality experience has continued to improve substantially and consistently. For example, the report accompanying the 2015 Valuation Basic Table states: "The current CSO table was created in 2001 based on experience from 1990-1995 and thus, is at least 20 years old. Since that time, industry experience studies performed by the Society of Actuaries Individual Life Experience Committee ("ILEC") have shown significant mortality improvement in the mortality experiences experienced by the industry from that underlying the 2001 CSO table development." Other surveys have also noted improvements in mortality. In May 2013, the reinsurance company RGA published a report sponsored by the SOA enumerating mortality rate and mortality improvements at older ages, which showed material rates of mortality improvements. The report was based on a survey of insurance companies. In March 2014, the actuarial firm Milliman published a report sponsored by the SOA called "Select Period Mortality" showing select rates of mortality that were strongly improved over 2001 VBT. This report was also the result of a survey of insurance companies.

48. This trend of improving mortality expectations has continued to the present day in the industry. In 2019, the SOA issued a report finding that in 2018, the United States age-adjusted

mortality rate realized its largest decrease since 2009, and the 2018 mortality rate is now the lowest mortality rate in U.S. history.

49. The SOA also tracks mortality specifically for group life policies. A 2006 study showed that for both males and females that mortality had significantly improved for almost all ages compared to a prior study from 1996. The study was repeated in 2014 and again mortality improved for males and females across most ages.

50. Industry insiders also report continuing and consistent mortality improvements. For example, statistics published by The Human Mortality Database (HMD, organized by the Department of Demography of the University of California, Berkeley), show lowering of mortality rates between 2002 (the year the Plaintiff policy was issued) and 2023 (the latest year for which HMD statistics are available) for older-aged individuals in the United States.

51. The cumulative effect of all these studies is an overall substantial improvement in mortality since the time the Plaintiff's policy was issued and represent a substantial benefit to MetLife.

**b. <u>Other Factors Do Not Warrant an Increase</u>**

52. MetLife also stated that the increase is based on other factors – it says the increase is "based on expectations of the future cost of providing the benefits under the policy." The policy does not permit an increase in COI rates "based on expectations of the future cost of providing the benefits under the policy." To the contrary, and by contrast, the policy does say that a *different* set of COI rates (for a spousal and child rider) "will be determined by us based on expectations as to future experience." That provision is *not* included in the provision governing the COI rates in the policy at issue in this case, which MetLife is increasing.

53. Factually, MetLife has not explained, nor could it, how expectations of future costs purportedly led to the massive increase. In fact, the massive increase could not be based on changes

to future cost factors, especially in light of improving mortality expectations, which outweigh any of these and any other cost factors.

54. ***First,*** MetLife's expectations as to future "expenses" could not have changed materially for the worse in recent years to warrant a COI increase, much less a massive one. Such expenses have at most only a minor impact on the expected future profitability of the Policies. The administrative expenses associated with the Policies are stable and predictable. The large majority of expenses incurred by an insurance company for universal life insurance policies occur at the time of sale the policy, with the commitment to pay original commissions to sales teams. MetLife cannot base its change on events that happened in the past (i.e., the sale of the policy). Additionally, the allocated expense of maintaining insurance contracts is nominal and does not materially change from year to year, let alone in a way that could justify such a massive increase in COI.

55. Moreover, the Policies already charge a separate "monthly expense charge" and premium charges designed to cover certain expenses. Periodically the SOA publishes the Generally Recognized Expense Table (GRET). In September 2024 the SOA published its recommendations for 2025. As can be seen from the tables below, most of the expenses for a life insurance policy are "Acquisition" costs – i.e., acquisition expenses, that are already incurred. The maintenance costs are a tiny fraction of the COI. For example, the direct marketing distribution channel annual maintenance cost of $72 per annum (p.a.) was only $26 p.a. more expensive than the equivalent figure ($46 p.a.) in 1998 and does not justify increasing the Plaintiff's COI charges so severely. Other distribution channels also do not suggest an increase large enough to justify the large COI rate increases implemented by MetLife.

TABLE 1
PROPOSED 2025 GRET FACTORS, BASED ON AVERAGE OF 2022/2023 DATA

| DESCRIPTION | Acquisition per Policy | Acquisition per Unit | Acquisition per Premium | Maintenance per Policy | Companies Included | Average Premium Per Policy Issued During Year | Average Face Amt (000) Per Policy Issued During Year |
|---|---|---|---|---|---|---|---|
| Independent | 204 | $1.10 | 51% | 61 | 147 | 3,008 | 241 |
| Career | 227 | 1.20 | 57% | 68 | 86 | 2,739 | 218 |
| Direct Marketing | 239 | 1.30 | 59% | 72 | 24 | 465 | 119 |
| Niche Marketing | 131 | 0.70 | 33% | 39 | 27 | 649 | 12 |
| Other* | 159 | 0.90 | 40% | 48 | 94 | 869 | 81 |
| * Includes companies that did not respond to this or prior year surveys | | | | | 378 | | |

| Expense Type | Expense Factor | GRET Year | Branch Office | Direct Marketing | Home Service | Career General Agency | Brokerage | PPGA | Multiline | Other Types |
|---|---|---|---|---|---|---|---|---|---|---|
| Maintenance | Per Policy | 1998 | $33 | $46 | $27 | NA | NA | NA | NA | $37 |
| | | 2001 | $35 | $43 | $30 | NA | NA | NA | NA | $39 |
| | | 2003 | $33 | $40 | $31 | NA | NA | NA | NA | $43 |
| | | 2006 | $38 | $56 | $36 | NA | NA | NA | NA | $39 |
| | | 2007 | $31 | $65 | $32 | NA | NA | NA | NA | $40 |
| | | 2008 | $27 | $56 | $37 | $54 | $42 | $40 | $56 | $36 |
| | | 2009 | $30 | $55 | $33 | $53 | $49 | $50 | $56 | $36 |
| | | 2010 | $30 | $50 | $35 | $55 | $49 | $45 | $61 | $37 |

Source: SOA GRET tables.

56. ***Second***, MetLife's expectations as to interest could not have changed materially for the worse in recent years to warrant an increase in COI rates, much less a massive one. Interest affects an insurance company's ability to generate income from investments related to its portfolio of insurance policies.

57. However, even if MetLife's current expectation is that the company will experience spread compression or even negative interest spreads with respect to the Policies, that would not and could not justify a COI rate increase of 96% and above. MetLife's alleged "expectations of *future* costs" logically cannot include any alleged interest-related losses in the *past*. The policies also have a separate "guaranteed interest rate," and a COI rate increase cannot be done to circumvent the guaranteed minimum.

58. ***Third***, MetLife's expectations as to future persistency could not have changed for the worse in recent years to warrant an increase in COI rates, much less a massive one. Plaintiff's policy was issued in 2002, and on information and belief, all of the Class Members' Policies have

been in force for more than 6 years. A 2012 SOA industry study – reporting on a survey of the industry – indicates that between 2001 and 2009, the industry lapse rates for universal life policies that have been in force more than 6 years are stable, varying less than approximately 2 percentage points over that span, and that the lapse rates become more stable the longer the policy has been in force. In September 2018 the SOA published an experience study for premium persistency and surrender/lapse experience for flexible premium life insurance updating the figures for lapse rates. The updated figures in this report show minimal change in lapse rates from the 2012 study. And to the extent MetLife priced the policies using unreasonable lapse-supported assumptions, it may not now pass the projected late duration losses on to persisting policyowners by increasing the COI rate.

59. Moreover, the only "cost" associated with persistency is incurred when Policies are surrendered, requiring MetLife to pay terminating Policyholders the cash surrender value of the surrendered Policy. And MetLife already levies an "administrative charge" for partial withdrawals. Where persistency is higher than MetLife assumed at pricing, thereby resulting in fewer surrenders, the costs attributable to cash surrender payments are lower, not higher, than projected when the Policies were priced. Accordingly, to the extent MetLife expected future persistency to be higher than it assumed when the Polices were designed and issued, that "cost factor" would benefit MetLife, and certainly would not support or justify a COI increase, much less this massive one.

60. ***Fourth***, MetLife's expectations as to future taxes could not have changed materially for the worse in recent years to warrant an increase in COI, much less a massive one. To the contrary, MetLife's expectations as to future taxes are now materially better, in light of the Tax Reform Act of 2017, which should have resulted in lower COI Rates, not an increase in rates.

61. Indeed, in its 2018 Annual Report, MetLife reported a net tax-related benefit for 2017 of $1.3 billion due to that year's Tax Reform Act. In Q1 2018, MetLife then announced a 31% jump in U.S. adjusted earnings, "primarily reflecting the impact of U.S. tax reform."

62. ***Fifth***, the policy states that the monthly cost of insurance rate is determined using the insured's attained age "at the beginning of each certificate year." But there have been no changes from the prior certificate year that could possibly justify such a massive increase in cost of insurance rates, even under MetLife's faulty rationale. In fact, MetLife's stated reason for the increase occurred over a decade ago, and cannot possibly warrant an adjustment in COI rates in 2025, when those rates are required by contract to be determined each year.

**c. The COI Hike Harms Policyholders**

63. MetLife knows, and fully expects, that many Class Members surrender or lapse their Policies following the COI increase. The COI increase letter itself mentions this possibility. To the extent that policyholders surrender or lapse their Policies following the COI increase, MetLife will wipe the unprofitable policies from its books.

64. MetLife has actively sought to encourage and provoke Plaintiff and Class Members to terminate their Policies or reduce the face amount of coverage enough to allow MetLife to collect the increased monthly deduction charges. In its form letter announcing the COI increase, MetLife suggested that policyholders may "Surrender your policy: You may choose to surrender your policy for the current cash surrender value, if any." MetLife also suggested class members may "reduce the face value of your policy," which would drastically reduce the insurance coverage while still allowing MetLife to pocket the increased COI charges as long as the Policy remained in force.

65. As a result of MetLife's actions, Class Members are faced with the decision of either paying the exorbitant and unjustified COI increase or forever forgoing the life insurance benefits for which they have dutifully paid premiums for years.

## CLASS ACTION ALLEGATIONS

66. This action is brought by Plaintiff individually and on behalf of a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. The class consists of:

> All owners of universal life insurance policies (including variable and group universal life policies) issued, insured or assumed by MetLife Life Insurance Company, or its predecessors or successors, subjected to any cost of insurance rate increases first announced in or after 2024.

67. The Class consists of hundreds of MetLife policyholders and is thus so numerous that joinder of all members is impracticable. The identities and addresses of the members of the Class can be readily ascertained from business records maintained by MetLife.

68. The claims asserted by Plaintiff are typical of the claims of the Class Members.

69. Plaintiff is willing and prepared to serve the Court and the proposed Class in a representative capacity. Plaintiff will fairly and adequately protect the interests of the Class and has no interests that are adverse to, or which materially and irreconcilably conflict with, the interests of the other members of the Class.

70. The self-interest of Plaintiff is co-extensive with and not antagonistic to those of absent Class members. Plaintiff will undertake to represent and protect the interests of absent Class members.

71. Plaintiff has engaged the services of counsel who are experienced in complex class litigation and life insurance matters, including COI increase matters, who will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiff and the putative Class members.

72. Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action. The names and addresses of all class members are in MetLife's business records, and class members are readily and objectively identifiable.

73. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include:

a. the construction and interpretation of the form insurance policies at issue in this litigation;

b. whether MetLife's actions to increase the COI rates on certain universal life policies violated the terms of those form policies;

c. whether Plaintiff and class members are entitled to receive damages as a result of the unlawful conduct by defendant alleged herein and the methodology of calculating those damages.

74. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a. because of the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

b. when defendant's liability has been adjudicated, claims of all class members can be determined by the Court;

c. this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

d. without a class action, many class members would continue to suffer injury, and defendant's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of its wrongful conduct; and

e. this action does not present any undue difficulties that would impede its management by the Court as a class action.

**CLAIM FOR RELIEF**

**Breach of Contract**

**(on behalf of Plaintiff and the Class)**

75. Plaintiff reallege and incorporate all allegations of this complaint as if fully set forth herein.

76. The Policies are binding and enforceable contracts.

77. At all relevant times, Plaintiff and other class members have paid premiums to MetLife and have otherwise performed all their obligations under the Policies.

78. The COI increase and conduct by MetLife that preceded it have materially breached the polices in several respects outlined above, including because the stated reasons for the increase breach the plain terms of the policy, and the stated reasons for the increase are factually incorrect. The implied covenant of good faith and fair dealing mandates that any redetermination be conducted in good faith, for reasons stated that are factually correct, on the basis of reasonable actuarial assumptions, and in compliance with actuarial standards. In the event that any breach

alleged herein is not explicitly covered by the terms of the contract, MetLife has breach the covenant of good faith and fair dealing by the conduct alleged above.

79. Plaintiffs have performed all obligations under the policies, except to the extent their obligations have been excused by MetLife's conduct as set forth herein.

80. As a direct and proximate cause of MetLife's material breaches of the policies, Plaintiff and class members have been - and will continue to be - damaged as alleged herein in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class, pray for judgment as follows:

1. Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding Plaintiff and the damages class compensatory damages, restitution, disgorgement, reinstatement of lapsed and/or surrendered policies, and any other relief permitted by law or equity;

3. Awarding Plaintiff and the damages class pre-judgment and postjudgment interest as well as attorneys' fees and costs, and all other relief set forth above;

4. Awarding Plaintiff and the classes such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and the class hereby demand a trial by jury as to all issues so triable.

DATED: July 11, 2025

Respectfully submitted,

By: */s/* Seth Ard

Seth Ard
Ryan Kirkpatrick
Zach Savage
Max Straus
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sard@susmangodfrey.com
rkirkpatrick@susmangodfrey.com
zsavage@susmangodfrey.com
mstraus@susmangodrey.com

Steven G. Sklaver (pro hac vice forthcoming)
Glenn Bridgman (pro hac vice forthcoming)
Kimberly Page (pro hac vice forthcoming)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com
kpage@susmangodfrey.com